653 So.2d 732 (1995)
Barbara EHRMAN
v.
HOLIDAY INNS, INC., et al.
No. 94-CA-0312.
Court of Appeal of Louisiana, Fourth Circuit.
March 29, 1995.
Writ Denied June 16, 1995.
*735 Walter A. Robelot, Robelot Law Firm, New Orleans, for plaintiff.
Sally A. Shushan, John W. Hite, III, and Edward J. Rivera, Sessions & Fishman, New Orleans, for defendant, Holiday Inns, Inc.
August J. La Nasa, Asst. City Atty. and Avis Marie Russell, City Atty., New Orleans, for defendant, City of New Orleans.
Mark C. Surprenant and A. Kirk Gasperecz, Adams and Reese, New Orleans, for Waste Management of New Orleans.
Before SCHOTT, C.J., and BARRY and BYRNES, JJ.
BYRNES, Judge.
Defendant, Holiday Inns, Inc. ("Holiday Inns") and plaintiff, Barbara Ehrman, appeal a judgment notwithstanding the verdict increasing the general damage award, as well as the jury verdict awarding damages for injuries suffered by plaintiff, who slipped and fell. We affirm.
On December 11, 1990 at approximately 10:30 a.m. the plaintiff fell while walking on Exchange Alley on a substance on the pavement at the entrance to a building leased by Holiday Inns and Allright Parking, Inc. ("Allright Parking") in the French Quarter. Ms. Ehrman was on her way to the Burger King Restaurant located adjacent to the Holiday Inns French Quarter on Canal Street.
On July 2, 1991 plaintiff filed a petition against the owner and hotel/lessor of the premises, Holiday Inns, as well as the City of New Orleans. Other parties were named as defendants, third-party defendants and/or cross-claimants, including the Burger King Corporation ("Burger King"), Al Copeland Enterprises, Inc. ("Copeland"), River Parish Disposal, which provided solid waste disposal services to Burger King and Holiday Inns; Waste Management of New Orleans (improperly identified as American Waste and Disposal), which serviced Copeland's Popeye's Fried Chicken, and Nautilus Insurance Company, the liability insurer of River Parish Disposal, Inc.[1] On September 3, 1992, the trial court severed Holiday Inns' incidental third party demand against Copeland as a result of pending bankruptcy proceedings.
At the end of the bifurcated trial the court dismissed all claims against the City. On May 11, 1993 the jury found that Holiday Inns was 40 percent negligent, Allright Parking was 40 percent negligent, and the plaintiff was 20 percent comparatively negligent. The jury awarded $70,000 in general damages, as well as $32,800 for past medical expenses.
On May 20, 1993 the trial court signed the judgment in accordance with the jury verdict and dismissed the claims against the other parties. On July 20, 1993, the trial court granted the plaintiff's motion for judgment notwithstanding the verdict solely on the issue of general damages, increasing that award from $70,000 to $150,000. Holiday Inns and the plaintiff appealed.[2]
The issues on appeal are: (1) whether the jury erred in its apportionment of fault; (2) whether solidary liability on the part of any defendants must be adjusted under LSA-C.C. art. 2324(B); (3) whether the trial court erred in granting a judgment notwithstanding the verdict on the general damage award; and (4) whether the jury erred in its assessment of the remaining damages.

APPORTIONMENT OF FAULT
Plaintiff argues that Holiday Inns rather than Allstate Parking had custody and control over the area where the accident occurred; that the City was liable for the potholes in Exchange Alley, which contributed to plaintiff's accident by allowing grease and *736 other substances to accumulate and eventually be deposited in the location of the accident, and that the plaintiff was not comparatively negligent.
Holiday Inns argues that it was not strictly liable under La.C.C. art. 2317 because it did not have custody and control over the area where the accident occurred because it did not lease any portion of the City sidewalk or the entranceways outside the building. Holiday Inns contends that it was not negligent because plaintiff did not show that Holiday Inns placed the foreign substance in the area. Holiday Inns claims that the City, Copeland, and/or Waste Management were at fault for the plaintiff's injuries because they created the hazardous condition in the street where food debris and standing liquids were allowed to remain in potholes on Exchange Alley. Holiday Inns also complains that the plaintiff was 100 percent at fault for being inattentive when she fell.
Mrs. Ehrman testified that she was walking down Exchange Alley towards Canal Street to get to the Burger King restaurant on the day of the accident. She crossed from the Popeye's side of Exchange Alley to the Holiday Inns/Allright Parking garage side because a Popeye's employee was hosing down the sidewalk. She had no difficulty walking on the sidewalk once she crossed over prior to reaching the entranceway to the Allright Parking garage and Holiday Inn. She testified that she did not intend to turn into the building but she walked straight down the sidewalk. She did not notice anything unusual about the area prior to her fall and did not see what she slipped on until after the accident. Immediately after the fall she saw a blackish streak one to three feet long and her clothes had a black, greasy substance on the right side. The entrance was not dark colored as the street was, but was not the same color as the sidewalk on each side.
Initially, to determine the apportionment of fault, the plaintiff must establish that one or more of the parties were negligent under La.C.C. art. 2315 or strictly liable under La.C.C. art. 2317.
In applying the law of negligence, the abutting property owners are under no duty to repair or maintain a public sidewalk. Monteleon v. City of New Orleans, 617 So.2d 49 (La.App. 4 Cir.1993). If the property owner caused the defect on the adjoining property, he might be held responsible. Simmons v. City of Lake Charles, 368 So.2d 1167, 1170 (La.App. 3 Cir.1979). The evidence shows that a foreign substance caused the plaintiff to fall; however, the record does not show who actually placed the substance on the pavement. Under La.C.C. art. 2317 strict liability is based on the relationship between the party (parties) with custody and the thing posing an unreasonable risk of harm to others. The article imposing liability is based on custody and not ownership. Thumfart v. Lombard, 613 So.2d 286 (La. App. 4 Cir.1993), writ denied, Montalbano v. Lombard, 617 So.2d 1182 (La.1993). This court stated:
Custody, distinct from ownership, refers to a person's supervision and control (garde) over a thing imposing an unreasonable risk of harm. Loescher v. Parr, 324 So.2d 441, 446 (La.1975).... Our Louisiana Supreme Court has recently used a two part test in determining whether the defendant has custody. First, the defendant should have a right of direction and control over the thing. Second, a court should examine what, if any, kind of benefit the defendant derives from the thing. Doughty v. Insured Lloyds Ins. Co., 576 So.2d 461, 464 (La.1991); King v. Louviere, 543 So.2d 1327, 1329 (La.1989).

Thumfart, 613 So.2d at 290.
To prove liability based on a defendant's custody, plaintiff must show that a defect, posing an unreasonable risk of harm to persons exercising ordinary care, caused plaintiff's injuries. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106 (La.1990). The question of garde or custody is largely one of fact and not one of law. Coleman v. Otis Elevator Co., 582 So.2d 341 (La.App. 4 Cir.1991).
In Thumfart, id., the property owner had obtained a permit and servitude to pave over the city property which separated a portion of his land which he leased to several businesses, including a lounge, pawn shop and *737 snowball stand. The property owner extended his parking lot and created another entrance to his property. The plaintiff fell in one of two holes: one on the defendant/owner's property or the Sewerage and Water Board uncovered meter box hole which was on city property but part of the parking lot. This court found that the property owner had the requisite supervision and control over the city property to impose strict liability. This court found that:
... The city property over which [the property owner] paved was not held out as a sidewalk or street for public use, but rather was developed for the exclusive and private use by patrons visiting the businesses located on his property. To suggest that the portion of the parking lot on city property was open to the public to use as they would a city street or sidewalk simply defies reality. We maintain that where an abutting landowner develops adjacent property and adopts it as his own for private, and not public, use, he may be held strictly liable for defects posing an unreasonable risk of danger located on such property.

Thumfart, id., 613 So.2d at 292.
In Pettis v. Hibernia National Bank, 94-1111 (La.App. 4 Cir. 12/15/94), 648 So.2d 27, the plaintiff slipped and fell on a ramp joining the sidewalk and street corner. Hibernia had a contract with an independent contractor to make interior and exterior modifications and repairs on its property, including construction of a new sidewalk in front of the bank. The City of New Orleans cut up the pavement at the other corner and installed a ramp. To avoid having the City tear up the sidewalk as planned, the contractor took it upon himself to design and build the ramp; however, his contract with Hibernia did not include the construction of a ramp at the corner. This court noted that the "duty imposed on a business to provide a safe place for its customers applies to the premises, but not to adjacent property unless the business created the hazard which causes the injury." Pettis, id., 94-1111, p. 2, 648 So.2d 27. This court found that the "sidewalk and ramp in question were not for Hibernia's exclusive use. They were for the use of any pedestrian choosing to pass there. The ramp was in the public domain." Pettis, id., 94-1111, p. 1, 648 So.2d 27. Finding that the plaintiff's accident occurred on City property and Hibernia did not create the hazardous condition, this court affirmed the dismissal of the action against Hibernia on motion for summary judgment.
In various cases Louisiana courts have looked to leases to determine whether parties incurred liability based on their contractual agreements. See Sanville v. Archdiocese of New Orleans, 560 So.2d 622 (La.App. 4 Cir. 1990); Billizone v. Winn-Dixie Louisiana, Inc., 521 So.2d 431 (La.App. 4 Cir.1988).
In the present case portions of Holiday Inns' lease with the property owner, Collins C. Diboll, provide:
1. In consideration of the rent hereinafter reserved and agreements hereinafter contained to be observed and performed by the Lessee and Lessor, Lessor has leased ... the real property situated on Royal Street, between Canal and Iberville Streets and backed by Exchange Alley, New Orleans, Louisiana....
* * * * * *
... Lessor shall make available to Lessee free of cost and at no charge to the Lessee sufficient and adequate parking spaces in the parking garage aforesaid up to a maximum of 224 parking spaces to be used by guests and patrons of Lessee as free parking for their automobiles.
* * * * * *
7.... Lessee promises throughout the term of the lease to take good care of the demised premises, both inside and outside,... and at the cost and expense of Lessee to keep premises in good repair and to keep the plumbing work, closets, sidewalks, curbs, gutters, drains ... in repair....
* * * * * *
.... Lessee agrees, at the expense of Lessee, to provide and keep in force comprehensive general liability insurance ... and protecting Lessor and Lessee against any liability to any person whomsoever for injury to person or damage to property *738 arising out of, or in connection with the Lessee's use of the demised premises or the condition of said demised premises....
* * * * * *
Lessee shall reimburse the Lessor at the end of each year that portion of the cost of liability insurance taken out by Lessor in respect to the parking garage and the parking garage operation to be conducted therein, which bears the same ratio to the total cost of such liability insurance as the average daily number of parking spaces used by Lessee's guests and patrons during that year (sic) bears to the total number of parking spaces available in the parking garage as determined by Lessor and Lessee at the end of such year.
"Schedule A" attached to the lease which provides a description of the property includes the following:
That portion of ground, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining....
The aforementioned premises shall be the location for the erection of the improvements which Lessor covenants herein that it will construct, but it is specifically understood by both parties herein that the leased premises shall constitute only that portion of said improvements, together with ingress and egress, designated in this lease. [Emphasis added.]
By the terms of the lease Holiday Inns agreed to take good care of the premises both inside and outside and at its cost to keep the premises in good repair, including sidewalks, curbs, gutters and drains; the property owner was released from liability; Holiday Inns's benefit from use of the Exchange Alley entrance was extensive; and Holiday Inns acquired custody or garde of the area where the plaintiff slipped and fell.
According to Holiday Inns' General Utilities Checklist, its employees were instructed in pertinent part to:
530-7am- (sic) hose down front and back of hotel (hose all corners of exchange (sic) ally (sic), scrub with buff machine and tri foam cleaner at least once weekly [sidewalk]) (sic), clean windows in front and sides of building, hose down flower boxes on ramp and wipe dry.
Considering that the Holiday Inns' employees acknowledged that there was an ongoing problem of a slippery, greasy substance on the pavement in the entrance driveway area on Exchange Alley, the instruction to the employees' to apply a degreaser once a week where only water was used to hose down the area once a day was inadequate. Holiday Inns is strictly liable for the dangerous condition which caused the plaintiff's injury.
Plaintiff argues that Allright Parking was not responsible for cleanup procedures, was not negligent and not liable.
More than one party may have custody and control or garde under La.C.C. 2317; even if Holiday Inns is liable, another defendant may be held liable by its own actions and relationship to the thing causing plaintiff's injury. Thumfart, supra, 613 So.2d at 289, fn 4.
Under the operating agreement between Allright Parking, "Manager", and Collins C. Diboll, the property owner, Allright Parking agreed to operate and manage a parking garage on the premises. The owner and Allright Parking agreed that construction of the garage, including geometric design of clearances, location of entrances, exits, ramp radius and ramp texture, as well as traffic flow patterns would be subject to the approval of the manager, Allright Parking. Further Allright Parking agreed to deduct from the gross receipts "the actual cost of insurance of the location, this to include public liability ... (with both Owner and Manager as named insureds), fire, theft and explosion coverage of all customers' automobiles, [as well as] property damage insurance."
Allstate Parking also agreed in pertinent part to the following terms contained in the operating agreement:
7. Owner shall not be liable to Manager or to Manager's employees, or to any patron of or visitor to said garage for any damage to person or property caused by an act of negligence of Manager or its *739 employees, or due to the premises operated by Manager, and Manager agrees to indemnify Owner and to hold Owner harmless from and against all demands, claims, causes of action and suits with respect to the operation of said parking garage.
The agreement also provides that:
10.... Manager shall be an independent contractor and Manager shall determine the policies, the parking rates to be charged and procedures that will be in effect in operating said garage. Manager shall not be requested to provide any service other than the parking and storage of automobiles....
Although Allright Parking was not responsible for cleanup procedures in the agreement and was not negligent, the terms of the lease show that it had custody or garde of the garage area to incur strict liability. The garage was constructed so that the beginning of the ramp leading to the garage on the second floor began on the first floor inside the Exchange Alley side of the building. To reach the garage ramp, customers would drive through from the Royal Street entrance or traverse the Exchange Alley entrance driveway. To leave the garage, it is necessary for all vehicles to exit out of the building on the Exchange Alley side. Because access to and from the garage required passage out and/or in the driveway area where plaintiff fell so that the driveway entrance/exit to the street was an integral part of the garage; because Allright Parking agreed to insure the operation of the garage and to indemnify the owner; because Allright had approval of the design of the garage; and because Allright Parking's business benefited immensely as it could not have operated without the driveway entrance/exit leading to Exchange Alley; Allright Parking had custody and garde of the driveway area where the plaintiff fell. A hazardous condition of the slick substance was created by vehicles tracking in substances from the street. Considering that Allright Parking had joint custody or garde of the area, and the dangerous condition was created by vehicular traffic which formed a necessary part of Allright Parking's business, the jury correctly found that Allright Parking and Holiday Inns were equally strictly liable.
Plaintiff also argues that the City was negligent in allowing a serious pot hole condition to exist on Exchange Alley which contributed to the plaintiff's injury despite actual notice of the condition, which was required for liability under LA-R.S. 9:2800.
In a City memorandum dated October 23, 1990 City Chief Engineer Clinton R. Hathaway noted that on inspection, "the roadway is in poor condition" and that detergents used by the commercial establishments along Exchange Place affected the life of the asphalt, causing failure of the pavement. Hathaway stated that repair would begin on Monday, October 23, 1990. The City's repair record dated October 25, 1990 shows that work was performed in the 100 block of Exchange Place on October 24, 1990, where under general remarks in the report form was written "Repaired subsidences with asphalt". On that form signifying "Final inspection by" appears the signature, "A. Sumler" and the date of October 30, 1990.
Ida Daniel, Administrative Services Supervisor with the City's Department of Streets, testified that possibly the Department of Streets received notification that the Mayor's office formed a French Quarter Revitalization Coordinating Board in October, 1990 to deal with problems in that area of the French Quarter; however, the Department of Streets had no record of such correspondence. The record does not show that it was likely that additional potholes appeared in the vicinity in the time period between the beginning of November 1990 and the date of the accident on December 11, 1990. Without any written information of additional notification after the street was repaired and inspected in October, 1990, the record does not reflect that the City received further notice of additional potholes in the area where the plaintiff fell. Therefore the trial court properly found that the City could not be held liable for plaintiff's injury.
With respect to Holiday Inns' contention that Copeland and/or Waste Management were liable based on the claim that they were responsible for the debris in the street, *740 the plaintiff testified that there was no garbage or grease in the street, which was dry on the day of the accident. There is little evidence of what substances actually contributed to the slippery condition of the pavement so that we cannot conclude that the jury was clearly wrong in determining that Copeland and/or Waste Management were not shown to be negligent or liable.
The plaintiff also contends that she exercised reasonable care for her safety when she fell and was not comparatively negligent.
A pedestrian has the duty to see that which should have been seen and would be discovered by a reasonably prudent person exercising ordinary care under the circumstances. Orleans School Bd. v. City of New Orleans, 585 So.2d 643, 647 (La.App. 4 Cir.1991), writ denied 589 So.2d 1069 (La. 1991).
In Bessard v. State, Dept. of Transp. and Development, 94-0589 (La. 11/30/94), 645 So.2d 1134, the Louisiana Supreme Court affirmed the ruling that the state was solely liable for plaintiff's injuries where the plaintiff slipped and fell on cracks in the curb as she was crossing the street after leaving a church. That court stated that photographs introduced into evidence at trial indicated that from the plaintiff's viewpoint, the cracks in the curb could not be seen. Further, the Louisiana Supreme Court noted that pedestrians cannot be expected to constantly look down while walking on a busy street. In Bessard, plaintiff's view was obstructed at the angle that she reached the curb after crossing the grass. Further, she was attempting to step off the sidewalk toward the curb to cross the street so that "she acted as an ordinary, prudent pedestrian by looking up to observe the traffic...." Bessard, 94-9589, p. 3, 645 So.2d 1134.
In the present case Ms. Ehrman testified that she did not see the slippery substance prior to her fall but that the "blackish" streak was one to three feet long. The pavement on the entrance/exit was not a dark color like the street. Considering that the dark slippery streak was not hidden and was large enough to be noticed by the reasonably prudent pedestrian, that Ms. Ehrman was not crossing the street but was walking straight ahead on the sidewalk, and that she did not testify that there was traffic in the vicinity that would avert her attention, the jury properly found that the plaintiff was 20 percent comparatively negligent.

SOLIDARY LIABILITY UNDER LA.C.C. ART. 2324(B)
With respect to solidary liability, plaintiff also argues that at a minimum Holiday Inns' percent of fault must be readjusted to 50 percent to comply with the requirements of La.C.C. art. 2324(B).[3]
In his article, Solidary Liability in Tort, part 2, 41 La.Bar Journal 334, 336 (Dec. 1993), Professor David W. Robertson states that under La.C.C. art. 2324 "recoverable damages is a notoriously ambiguous phrase which might mean total damages; total damages *741 less reductions to reflect the fault of plaintiff; or it might mean total damages less reductions to reflect the fault of plaintiff and the fault of any settling tort feasors." Referring to Professor Robertson's article and Touchard v. Williams, 617 So.2d 885 (La. 1993), plaintiff maintains that law in derogation of established rights of long-standing are to be strictly construed to make the least change in the existing law; therefore, under La.C.C. art. 2324 "recoverable damages" means "total damages" so that Holiday Inn's liability should be modified and recast to 50 percent of plaintiff's total damages without a reduction for plaintiff's comparative negligence.
In Touchard, the Louisiana Supreme Court found that La.C.C. art. 2324 provides a cap on solidarity among joint tortfeasors of 50 percent of plaintiff's "recoverable damages". In that case the plaintiff was free from fault, and the Supreme Court did not state whether or not "recoverable damages" meant "total damages".
In Gauthier v. O'Brien, 618 So.2d 825 (La. 1993), the Louisiana Supreme Court held that in worker's compensation cases employer fault must be assessed by the fact finder in order to appropriately assess the fault of third party tortfeasors although the employer is immune from suit in tort, indemnity and/or contribution and cannot be required to pay damages. In that case, the plaintiff was not at fault, and the Supreme Court did not consider the interpretation of the term "recoverable damages".
In Veazey v. Elmwood Plantation Associates, Ltd., 93-2818 (La. 11/30/94), 646 So.2d 866, the Louisiana Supreme Court concluded that it is permissible to assess fault between intentional and negligent tort feasors on a case-by-case basis. Again, the Louisiana Supreme Court did not interpret the meaning of "recoverable damages" under La.C.C. art. 2324.
In Touchard, the Supreme Court recognized that the legislature intended to provide for victim compensation but it also sought to protect defendants from the effect of the former law of solidarity and to limit liability. See Thomas C. Galligan, Jr., Article 2324: The Discombobulating State of Solidarity in Post Tort Reform Louisiana, 54 La.L.Rev. 551. Under the heading, "B. Recoverable Damages: 50% of What?", Galligan states:
.... Article 2324(B) limits the solidary liability of a joint tortfeasor to 50% of "recoverable damages." It does not say either 50% of damages or 50% of the judgment amount; it says 50% of "recoverable damages". This has led to the argument that in cases where the plaintiff is at fault, the defendant's 50% solidary obligation should be 50% of the judgment amount less the plaintiff's fault, not 50% of the judgment amount. Apparently the genesis of the argument is merely the word "recoverable." That is, if the legislature had meant 50% of the judgment amount it would have said that, or at least it would have said 50% of damages, not 50% of recoverable damages....
Galligan, 54 La.L.Rev. at 574.
Considering that under La.C.C. art. 2324 the legislature did not state that joint tortfeasors are liable for 50% damages or 50% of the judgment amount or 50% of the total damages where it could have easily done so, the use of the phrase "recoverable damages" implies a different meaning. If the legislature intended "recoverable damages" to reflect the fault of plaintiff and the fault of any settling tortfeasors, the legislature would not have limited recovery to 50 percent but would have provided that the defendants would only be liable for their individual fault. Because the legislature was revising the law on solidary liability in conjunction with the concept of comparative fault, it would be appropriate that the plaintiff's fault should be assessed. Balancing the legislative intent to provide victim compensation as well as limited liability for the defendants, this court interprets "recoverable damages" to mean total damages minus a reduction of the plaintiff's fault. Therefore, Holiday Inns would be liable for 50 percent of the recoverable damage award which would consist of the amount of the total damage award reduced by 20 percent to account for plaintiff's comparative negligence.

JUDGMENT NOTWITHSTANDING THE VERDICT
Holiday Inns complains that the trial court erred in granting a JNOV and increasing the *742 jury's general damage award of $70,000 to $150,000. Plaintiff contends that the trial court's general damage award of $150,000 was below that which a reasonable trier of fact could award.
A motion for JNOV may be granted on the issue of liability or on the issue of damages or on both issues. La.C.C.P. art. 1811(F). In Anderson v. New Orleans Public Service, 583 So.2d 829, 833-834 (La.1991), the Louisiana Supreme Court focused on the issue of damages, stating:
Once a trial court has concluded that a JNOV is warranted because reasonable men could not differ on the fact that the award was either abusively high or abusively low, it must then determine what is the proper amount of damages to be awarded. In making this determination, the judge is not constrained as the courts of appeal are to raising (or lowering) the award to the lowest (or highest) point which is reasonably within the discretion afforded that court.
* * * * * *
The trial judge is in a better position to make a damage assessment than is the appellate court. The trial judge hears the testimony, views the evidence, and is able to evaluate the credibility of the witnesses. Once the jury verdict is set aside under the strict JNOV standards, the trial court is then the trier of fact. It should not be limited by the same constraints placed upon an appellate court reviewing a damage award. The trial court should make an independent assessment of the damages and award a proper amount of compensation under the facts of the particular case.
General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Glasper v. Henry, 589 So.2d 1173 (La.App. 4 Cir.1991), writ denied 594 So.2d 1315 (La.1992). Holiday Inns asserts that the plaintiff's medical condition was greatly disputed before and after the accident, and that there was no evidence that plaintiff was physically disabled from performing her job or that she had actually suffered a loss of enjoyment of life. Holiday Inns questioned plaintiff's credibility as to her complaints, pointing out that she did not disclose to her physicians, Dr. Laxman S. Kewalramani or Dr. Toussaint LeClercq, the neurosurgeon who performed her cervical laminectomy as well as percutaneous discectomy, that she had a prior accident in March 1990 when she hurt her back when attempting to lift a window, and she went to the emergency room at Mercy Hospital. Nor did she relate to Dr. LeClercq that she had received a whiplash injury in a motor vehicle accident 15 years earlier. However, when a tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim for the extent of the aggravation. Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993). Holiday Inns also notes that plaintiff's second operation performed by Dr. LeClercq was minor, only required one day in the hospital, involved no stitches, cutting, bleeding or complications. Holiday Inns further states that Dr. LeClercq did not recommend that the plaintiff stop working and did not find the need for future surgery or treatment.
The record shows that Barbara Ehrman was 54 years old at the time of the accident. She was treated in the emergency room at Hotel Dieu on the day she fell on December 11, 1990. She saw Dr. Stewart Altaman, a general surgeon, until after January, 1991 when she went to Mexico where she was employed for two and a half months. Plaintiff testified that she did not seek treatment in Mexico because she found that the medical facilities were not up to par. She continued to take pain medication.
After she returned to New Orleans, in April 1991, Ms. Ehrman went to Dr. Laxman S. Kewalramani, who engaged in physical and orthopedic medicine. She began seeing a neurosurgeon, Dr. Toussaint LeClercq, in August 1991. On August 12, 1991 an MRI revealed a C6-7 herniation and an L4-5 herniated disc. Dr. LeClercq performed cervical fusion and discectomy at the C6-7 level on October 28, 1991. He later performed a percutaneous discectomy wherein a needle, or nucleotome, was introduced into the plaintiff's lumbar spine at the herniated L4-5 *743 level and the disc was chopped and suctioned. Plaintiff testified that she continued to work in pain only because she was the sole means of her support.
In reviewing the judge's decision to grant plaintiff's motion for JNOV on the issue of damages, we find no error in the trial judge's determination that the motion was properly granted to increase the general damage award since reasonable jurors could not differ as to the fact that the jury's general damage award was abusively low.
Because the trial court properly granted the JNOV, and its damage award is based on its de novo review and independent assessment of injuries and damages, the trial judge's decision is the judgment of the trial court, which is reviewed on appeal under the constraints of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), where this court is relegated to determining whether the record supports a conclusion that $150,000 lies within the wide range of discretion accorded the trier of fact. See Anderson v. New Orleans Public Service, 583 So.2d at 834. When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La.C.C. art. 1999; Coco. The reviewing court must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La.1979). After a review of the evidence in the present case, we conclude that the $150,000 general damage award was proper and not an abuse of the trial court's great discretion.

EARNING CAPACITY
Plaintiff further claims that the jury erred in failing to award damages for impaired earning capacity and future vocational services. Loss of earning capacity, not just pecuniary loss, is the basis for assessing loss of wages. Folse v. Fakouri, 371 So.2d 1120 (La.1979). In Finnie v. Vallee, 620 So.2d 897, 900-901 (La.App. 4 Cir.1993), writ denied 625 So.2d 1040 (La.1993), this court stated:
Loss of earning capacity is not the same as lost wages. Rather, earning capacity refers to a person's potential. Earning capacity is not necessarily determined by actual loss. While the plaintiff's earnings at the time of the accident may be relevant, such figures are not necessarily indicative of her past or future lost earning capacity. The plaintiff need not be working or even in a certain profession to recover this type of award. What is being compensated is the plaintiff's lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). The trial court should consider whether and how much the plaintiff's current condition disadvantages him in the work force. The trial court should then ask itself what the plaintiff might be able to have earned but for his injuries and what he may now earn given his resulting condition.
At the time of trial Mrs. Ehrman had been employed for several years by the Quarterhouse, selling real estate time shares on a commission basis and earning approximately $45,000 annually. Before her accident, Ms. Ehrman had been promoted to assistant sales director earning approximately $85,000 for one year when she returned to her position as a salesperson. She graduated from high school and business college, and she obtained a real estate license. Prior to her present sales position, she was employed in semi-skilled jobs including employment as a receptionist, secretary, bartender, and a dealer at a gambling establishment as well as a salesperson selling Avon products.
Bobby S. Roberts, an expert in the field of vocational evaluation, considered plaintiff's complaints of continued pain and recommended that Ms. Ehrman enter a six-month structured work recovery rehabilitation program to help her function better. He estimated that the program would cost $24,000. Dr. Melvin Wolfson, an expert in the field of forensic economics, projected Ms. Ehrman's impaired earning capacity as slightly over $113,000.
Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal. The discretion *744 vested in the trier of fact is "great", and even vast in determining the amount of damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, Maritime Overseas Corp. v. Youn, ___ U.S. ___, 114, S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Although Dr. LeClercq estimated that Ms. Ehrman incurred 25-30 percent anatomical disability, he did not restrict Ms. Ehrman from returning to work. His recommendation was limited to prohibiting repetitive movements, and prohibiting bending or lifting, pushing, pulling or carrying around 25-30 pounds. He found that Ms. Ehrman was improving after the surgical procedures, and he stated that her post-operative pain had improved so that no prescriptive pain medication was required. There was evidence that the plaintiff would continue to find employment similar to that which she had obtained prior to the accident. The general damage award of $150,000 also compensates for plaintiff's pain and suffering. The jury did not abuse its vast discretion in refraining from awarding damages for loss of plaintiff's earning capacity.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
SCHOTT, C.J., dissents and assigns reasons.
SCHOTT, Chief Judge, dissenting:
Plaintiff had an unfortunate accident for which a jury found she was 20 percent at fault. Plaintiff argues persuasively that the allocation of any fault to her was manifestly erroneous, but an equally persuasive argument could be made that the accident was all her fault or at least more her fault than the 20 percent allocated to her. In the final analysis, there is no logical reason to set aside the jury's finding in this regard. Both parties are stuck with it.
The problem with the jury's allocation of fault to Holiday Inn is completely different because whether Holiday Inn is liable at all is a question of law and not of fact. This accident happened when plaintiff tripped or slipped on some greasy or slippery substance as she walked along a public sidewalk. As my colleagues point out, the law is clear that a property owner is not responsible for the condition of an adjacent public sidewalk unless he makes some special use of the sidewalk. Nor is he under any obligation to maintain the sidewalk.
Plaintiff seems to concede this principle, but would make an exception for Holiday Inn because of 1) the lease between it and the owner of the property and 2) the theory that Holiday Inn voluntarily assumed responsibility for the sidewalk.
As for the lease, we must begin with the understanding that whatever rights Holiday Inn had in these premises were granted by the owner. Furthermore, the owner would have no interest in transferring to Holiday Inn obligations he did not have. Naturally, the owner would insist on indemnification by his lessee and would insist on the lessee providing him with insurance, but this has nothing to do with whether or not claims by third parties are legally valid.
Plaintiff relies on the following provisions of the lease to impose liability for her fall:
.... Lessee promises throughout the term of the lease to take good care of the demised premises, both inside and outside, and all structures from time to time thereon and to suffer no waste, and at the cost and expense of Lessee to keep premises in good repair and to keep all plumbing work, closets, sidewalks, curbs, gutters, drains... in repair.... (Emphasis added.)
At the beginning of the lease "demised premises" is defined as follows:
All of said real property, together with improvements thereon as described in said plans and specifications, but excluding the parking garage, and areas reserved for first floor commercial stores.... (Emphasis added.)
Plaintiff argues that the parking garage is on the second floor and above but that the ramp to the second floor is no part of it. She also seems to contend that because 224 parking spaces were set aside for Holiday Inn the parking garage existed for the sole benefit of Holiday Inn. The operating agreement between the owner and Allright provides:

*745 It being understood that the parking garage facility will be operated independently, separate and distinct from any motel or hotel operation whose customers will also use the parking facility, but be ticketed subject to motel validation similar to the general public users.
In the lease between the owner and Holiday Inn the following addressed the parking problem:
The Lessor hereby covenants and agrees that at all times during the currency of this lease, including any renewal period hereof, Lessor shall make available to Lessee free of cost and at no charge to the Lessee sufficient and adequate parking spaces in the parking garage aforesaid up to a maximum of 224 parking spaces to be used by guests and patrons of Lessee as free parking for their automobiles.
According to the operating agreement, there are approximately 375 parking spaces and this agreement makes no mention of any spaces to be reserved or set aside for Holiday Inn.
What emerges from these agreements is that the owner has several operations being conducted in his building including a public parking garage, a hotel, and some commercial shops. These are independent of each other. As far as Allright is concerned, guests of Holiday Inn are no different than anyone else who parks there. If Holiday Inn closes, the parking lot will continue. If Allright defaults, the owner will hire another operator.
A ramp from the ground floor to the floors above where vehicles are parked is an integral part of the garage. Without it the garage could not function. Consequently, the exclusion of the garage from the "demised premises" also excludes the ramp to the garage. The argument that Holiday Inn assumed responsibility in its lease for the public sidewalk adjacent to the garage ramp is without merit.
Next plaintiff argues that Holiday Inn by assuming the task of cleaning up the sidewalk adjacent to its facility assumed liability for the presence of the slippery substance on the sidewalk. In support of this argument she cites Rick v. State, DOTD, 630 So.2d 1271 (La.1994) and Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). In the Rick case the state assumed the duty to upgrade a rail crossing. Once it began the process an inordinate delay occurred on the part of the railroad which had to approve the plan. During this delay a fatal accident occurred because of the dangerous condition of the crossing. In finding the state liable the court stated:
Here, it is unnecessary to decide whether the DOTD had an affirmative duty because the DOTD assumed a duty to up-grade this crossing by selecting it for improvement on September 10, 1986. Once a duty is assumed, negligent breach of that duty may create liability. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La. 1984).
In the Pizza Hut case the defendant provided an armed guard for the safety of its customers. In a robbery attempt the guard and the robber had a shootout in which a patron was injured.
In these cases the act of negligence occurred while the defendants were in the process of performing the assumed duty. An analogous situation would be if a Holiday Inn employee while hosing down the sidewalk were to negligently spray a passerby Holiday Inn would be liable for the damage. But the assumption of the responsibility of actively cleaning up the sidewalk does not carry with it the passive responsibility of a blanket, continuing indemnification in favor of the public against harm from hazards which occur between cleanings.
If Rick and Pizza Hut mean what plaintiff says in this case, the ramifications would be momentous. The homeowner who sweeps the sidewalk, picks up trash and debris, and even hoses it down occasionally would become the insurer of all who pass by against hazards on the sidewalk. The good neighbor volunteer would inadvertently become the insurer of the general public.
Perhaps it seems harsh to leave the plaintiff in this case without a remedy, but the occurrence of an accident does not necessarily entitle one to collect damages. In the *746 present case the most likely culprit was the City because the accident and the hazard were located on public property. Even so, plaintiff was confronted with the heavy burden of proving actual or constructive knowledge of the defect on the City's part. R.S. 9:2800. So the easier target was Holiday Inn and the jury found it. The problem I have is the lack of any legal basis for its liability. Well meaning sympathy for the injured plaintiff should not lead us to distort the law. Of all the potential targets Holiday Inn is the least vulnerable under the law because this was not only a public sidewalk, but the hazard was adjacent to Allright's parking ramp to its public parking garage as to which Holiday Inn had no involvement whatsoever other than for its guests to use along with the rest of the general public.
NOTES
[1] Plaintiff did not name Allright Parking as a defendant in the action.
[2] Plaintiff claims that Holiday Inns only appealed the July 14, 1993 judgment of the trial court on the increase in the general damage award but did not appeal the jury verdict and the judgment dated May 20, 1993. Because the trial court upheld the remainder of the jury verdict in the final judgment of July 14, 1993, an appeal of that judgment also encompasses appeal of the jury verdict.
[3] Article 2324 provides:

A. He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
B. If liability is not solidary pursuant to Paragraph A, or as otherwise provided by law, then liability for damages caused by two or more persons shall be solidary only to the extent necessary for the person suffering injury, death, or loss to recover fifty percent of his recoverable damages; however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of fault has been attributed. Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution. Except as described in Paragraph A of this Article, or as otherwise provided by law, and hereinabove, the liability for damages caused by two or more persons shall be a joint, divisible obligation, and a joint tortfeasor shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, or immunity by statute or otherwise.
C. Interruption of prescription against one joint tortfeasor, whether the obligation is considered joint and divisible or solidary, is effective against all joint tortfeasors. Nothing in this Subsection shall be construed to affect in any manner the application of the provisions of R.S. 40:1299.41(G). [Emphasis added.]