669 So.2d 504 (1996)
Gladys HEAD,
v.
PENDLETON MEMORIAL METHODIST HOSPITAL, et al.
No. 95-CA-0461.
Court of Appeal of Louisiana, Fourth Circuit.
January 31, 1996.
*505 Bruce A. Cranner, Blue Williams, Metairie, for Defendant/Appellant, The Louisiana Patients' Compensation Fund.
Allan Berger, New Orleans, for Plaintiff/Appellee.
Before KLEES and BYRNES and LANDRIEU, JJ.
BYRNES, Judge.
Defendant, The Louisiana Patients' Compensation Fund (the "Fund"), appeals a judgment awarded to Vera Booth as representative of the plaintiff, the late Gladys Head, for injuries to her right hand resulting from the administration of a wet-heat treatment during occupational therapy at Pendleton Memorial Hospital ("Methodist Hospital"). We affirm.
Gladys Head, a resident of the Les Fontaine Retirement Community in New Orleans, suffered with diabetes, a stroke, and other cardiovascular problems. When she lost feeling, particularly in her right hand, she underwent therapy at Methodist Hospital. After an assistant associated with occupational therapist Barry Fitterer, administered a wet-heat treatment on February 19, 1991, the nursing home employees noticed what appeared to be burns on Ms. Head's right hand.
On February 26, 1991, Dr. Edward M. Campbell, a plastic surgeon specializing in hand surgery, performed a debridement procedure at Methodist Hospital, where the dead tissue was removed from Ms. Head's hand wounds. On March 7, 1991, Dr. Campbell performed additional skin debridement with the application of a regular dressing to the surgery site. On March 12, 1991, Dr. Campbell amputated the tips of the index and middle fingers of Ms. Head's right hand, at the point of the first joints of the fingers. He also performed a skin graft onto her little finger. Ms. Head was discharged on March 18, 1991, and she returned to the nursing home.
Ms. Head continued to suffer physical and emotional problems. On May 6, 1991, Ms. Head was admitted to Riverbend Hospital, a psychiatric facility, as a result of depression. Dr. Milton J. Harris, Jr. diagnosed that she *506 was suffering from a major depressive disorder. After being treated with therapy and medication, Ms. Head returned to the nursing home on May 27, 1991.
Ms. Head's sister moved to the nursing home, became Ms. Head's roommate, and then died. Shortly thereafter, Ms. Head was readmitted to Riverbend Hospital in September 1991 for depression. Ms. Head was discharged from Riverbend Hospital on October 1, 1991, she returned to the nursing home, and she continued to receive physical and occupational therapy. She was treated by Michael Diaz, an occupational therapist, after her burn injury. After Ms. Head went to live for three months with her grand-niece, Ms. Vera Booth, Ms. Head died in July 1992.
On July 10, 1991, Ms. Head filed a petition against Methodist Hospital and its insurer based on the burn incident and amputations, alleging medical negligence on the part of Methodist Hospital and its employees. On February 6, 1992, she amended her petition to add defendants, Barry Fitterer, the occupational therapist responsible for administering the wet-heat pack treatment to Ms. Head's hands, and Health Focus, Inc., the independent contractor that employed Mr. Fitterer.
On March 4, 1992, the parties entered a settlement agreement where the defendants would pay Ms. Head $100,000 under the Louisiana Medical Malpractice Act. Ms. Head reserved her right to pursue additional damages from the Louisiana Patients' Compensation Fund. The trial court approved the settlement in its judgment dated March 16, 1992.
During the trial in May 1994, Vera Booth, the sole legatee under Ms. Head's will, was substituted as party plaintiff. After the jury awarded $400,000 in general damages, the trial court entered a judgment against the Fund on May 9, 1994, which incorporated the $400,000 jury verdict with the parties' stipulations deducting $100,000; an award for medical expenses (which was reduced by $36,708.12, representing the amount paid by Medicare to Ms. Head); and expert witness fees as well as legal interest.
On May 16, 1994, the Fund filed a Motion for Judgment Notwithstanding the Verdict (JNOV), which was set for hearing on July 24, 1994. The Fund filed a motion for suspensive appeal which was granted on May 26, 1994. Without opposition, this court recently granted Warren A. Forstall's motion to amend the trial court's judgment of May 9, 1994, and to name him as the judgment creditor.
On appeal the Fund contends that: (1) plaintiff failed to provide evidence of causation or proof that Ms. Head's second admission and psychiatric treatment at Riverbend Hospital and additional occupational therapy were causally related to her February 19, 1991, burn injury; (2) the jury erred in its assessment of general damages; and (3) the trial court erred in failing to act on the Fund's Motion for JNOV.

MOTION FOR JNOV
In considering the last issue, the Fund requests that this case be remanded to give the trial court jurisdiction to hear the Fund's motion for JNOV prior to the appeal.
The Fund contends that the trial court is required to rule on the Fund's motion for JNOV within 30 days of the judgment of May 9, 1994, because that is the time period allowed for a suspensive appeal. La.C.C.P. arts. 2087 C and 2123 B provide that the time for a suspensive appeal does not begin to run until a timely request for a motion for JNOV has been ruled upon by the trial court. Therefore, it is the motion for JNOV that governs the appeal, not the appeal that governs the time of the motion for JNOV. While it is true that a party cannot waive jurisdiction, a party has the right to withdraw, abandon, or have its own motion for JNOV dismissed.
In Sledge v. Continental Cas. Co., 26,472 (La.App. 2 Cir. 1/25/95), 654 So.2d 358, vacated on rehearing (5/10/95), the appellate court found that when a timely motion for new trial is pending, the defendants' appeal is premature and subject to dismissal because the motion suspends the operation of the final judgment. In that case the opposing parties, the plaintiff, filed a motion for JNOV and, alternatively, a motion for additur, and in the *507 further alternative, a motion for new trial; however, the defendants, are the parties who appealed before the trial court ruled on the motion for JNOV and alternative motions for additur or new trial. See also Petitto v. McMichael, 552 So.2d 790 (La.App. 1 Cir. 1989), appeal after remand 588 So.2d 1144 (La.App. 1 Cir.1991), writ denied 590 So.2d 1201 (La.1992).
At issue in Winterrowd v. Travelers Indem. Co., 440 So.2d 822, 824 (La.App. 2 Cir.1983), was the timeliness of the defendant's appeal after the trial court denied the defendant's motion for JNOV and motion for new trial. The appellate court equated the motion for JNOV with the motion for new trial with respect to the effect of the delay of the appeal. The trial court ruled on the post-judgment motions so they were not abandoned prior to the appeal.
In Ehrman v. Holiday Inns, Inc., 94-0312 (La.App. 4 Cir. 6/30/94), 639 So.2d 1204, affirmed, 94-0312 (La.App. 4 Cir. 3/29/95), 653 So.2d 732, writs denied, 95-1051 & 95-1058 (La. 6/16/95), 655 So.2d 343, plaintiff filed for a motion for JNOV, which was granted. Defendant, Holiday Inns, then filed a motion for reconsideration, new trial and/or JNOV, which was denied. Then defendant Holiday Inns filed a suspensive appeal, and plaintiff answered the appeal. This court found that the time for appeal began to run from the date of the denial of the defendant Holiday Inns' motion for new trial, and therefore the defendant's appeal was timely. The trial court had previously ruled on the post-judgment motions so they were not abandoned prior to the defendants' appeal.
In the present case where the Fund filed for the motion for JNOV as well as the motion for the appeal, the Fund is deemed to have abandoned its own motion for JNOV. Rather than being deprived of a ruling on the motion for JNOV by another opposing party's filing a motion for an appeal, the Fund waived and abandoned its own motion, thereby depriving itself of the ruling on the motion for JNOV. Therefore, this court is properly vested with appellate jurisdiction in the present case.

CAUSATION: SECOND PSYCHIATRIC TREATMENT AT RIVERBEND HOSPITAL AND LATER OCCUPATIONAL THERAPY
The Fund also argues that the plaintiff did not prove that Ms. Head's admission and treatment at Riverbend Hospital for a major depressive disorder in September 1991 and Ms. Head's occupational therapy from March 13July 30, 19092, were causally related to Ms. Head's February 19, 1991 burn injury.
In a personal injury suit, the plaintiff has the burden of proving, by a preponderance of the evidence, a causal connection between the injury sustained and the accident which caused the injury; the test for determining the causal connection between the accident and the subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident. Maranto v. Goodyear Tire & Rubber Co., 94-2603,, pp. 3, 6 (La. 2/20/95), 650 So.2d 757, 759, 761. The defendant takes its victim as it finds him and is responsible for all natural and probable consequences of its negligence. If a defendant's conduct aggravates a pre-existing injury or condition, the defendant must compensate the victim for the full extend of the aggravation. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991), on remand, 24114 (La.App. 2 Cir. 5/18/95), 661 So.2d 503, rehearing granted (6/15/95), as amended on rehearing (8/3/95). The fact finder has a duty to assess the credibility of the witnesses, and the determination of fact may not be disturbed on appeal unless the record establishes that the finding is clearly wrong or manifestly erroneous. Alexander v. Pellerin Marble & Granite, 93-1698, p. 5 (La. 1/4/94), 630 So.2d 706, 710. A jury's finding in questions of causation are subject to the manifest error-clearly wrong standard. Young v. Armadores de Cabotaje, S.A., 617 So.2d 517, 537 (La.App. 4 Cir.1993), writs denied, 625 So.2d 170 & 171 (1993), certiorari denied, ___ U.S. ___, 114 S.Ct. 1067, 127 L.Ed.2d 386 (1994).
Although the Fund does not contend that Ms. Head's first hospitalization and psychiatric *508 treatment for major depression at Riverbend Hospital was causally related to the burn injury, the Fund argues that other factors, including the facts that the plaintiff's sister had to live at the nursing home and subsequently died, that the plaintiff's physical condition continued to deteriorate, and that her symptoms were due to side effects of the drug therapy interacting with her diabetes, contributed to Ms. Head's severe depression and her readmittance to Riverbend Hospital for psychiatric treatment.
Carol Willis, the plaintiff's primary care nurse, testified that prior to the burn injury, the plaintiff could walk with the aid of a walker, feed and dress herself. She could also light and smoke cigarettes. Afterwards the plaintiff was severely depressed. The nurse also testified that Ms. Head never seemed to come out of her depression, she could not light or hold a cigarette, and she could not use a walker because of the burn injury. Nurse Willis stated that after the amputation, plaintiff lost the use of her hand and was unable to do anything for herself. Ms. Head hated being a bother or burden to anyone.
Dr. Walter Vogt, a neurologist, reviewed the plaintiff's pre-existing history of diabetes and neuropathy. Before the burn injury, the plaintiff seemed able to take care of herself and enjoy life. After the burn injury and resulting amputation, Dr. Vogt found that the plaintiff seemed depressed and not the same person. Dr. Vogt opined that there was no sharp increase in diabetic neuropathy before and after the burn.
Dr. Milton Harris, the psychiatrist who treated Ms. Head at Riverbend Hospital, found that the plaintiff was severely depressed, had crying spells and sleep loss, as well as feelings of helplessness and hopelessness after the burn injury. She felt useless and had a preoccupation with wishing she were dead. Dr. Harris opined that the burn injury and subsequent amputation were the primary precipitant to the plaintiff's condition. Although she was discharged from Riverbend Hospital in three weeks, she returned in September 1991. At the time of her second admission to the hospital, Dr. Harris noted that Ms. Head had feelings of sadness at the loss of her physical functions, and she felt that there was no point in living. Dr. Harris related that prior to the burn Ms. Head never had a major depressive disorder and had managed to cope with the severe stress of having diabetes for 20 years as well as the neuropathy without depression. Dr. Harris stated that: "had she not had that (burn) injury, that ... second episode, the depression ... would not have come about."
Vera Booth, Ms. Head's niece, testified that Ms. Head was quiet but happy before the burn injury; however, she became depressed and gave up after the injury.
Dr. Edward M. Campbell, a plastic surgeon, performed two operations: first to remove dead skin and second, to amputate the tips of two of Ms. Head's fingers on her right hand because she developed dry gangrene. Dr. Campbell stated that Ms. Head was very upset over the fact that when she was being treated for her hand, that very treatment resulted in her injury. Dr. Campbell concluded that Ms. Head "still would have an impairment rating because of the burn bordering on 20 to 25, 30 percent based on those four digits because all four digits were involved." He explained that 20-30% disability was on top of the 55-60% pre-existing impairment from diabetes and polyneuropathy so that Ms. Head had 78-84% impairment to her right hand.
The witnesses agree that the plaintiff had pre-existing conditions prior to her burn injury that caused her to be impaired. However, the record shows that before the burn injury, the plaintiff could use a walker and take care of her personal hygiene, but she could not do so afterward. The jury as trier of fact was not clearly wrong in finding that the burn injury was causally related to Ms. Head's admission to Riverbend Hospital from September 12 to October 1, 1991 for severe depression, which resulted not only from her sister's death but because Ms. Head still was unable to use a walker and take care of her personal hygiene, and she felt hopeless about regaining her ability to take care of herself in the future.
The Fund also contends that Ms. Head had recovered to her pre-burn injury level of functioning by December 6, 1991 so that Ms. Head's occupational therapy treatments from *509 March 13-July 30, 1992 were not related to the burn injury. The Fund relies on Plaintiff's Exhibit 12, the updated plan of care/progress reports for rehabilitation, and the Fund avers that Ms. Head could again dress herself with the exception of buttons and could feed herself.
In Exhibit P-12, the occupation therapy progress report dated 1/6/92 shows the following patient's goals:
1) Pt. will be I c feeding using a universal cuff
2) Pt. will transfer from bed to w/c minimal assist
3) Pt. will dress error UE c min. A using adapted
 equipment and or techniques.
Thereafter, on the same date (1/6/92), the notation under the "functional level (at the time of re-eval)" includes the following:
Functioning Skills
 Dressing - U.E. Mod Assist.
 L.E. - Mod assist c panties, max assist c
 socks 2° to & [illegible]
 Feeding - Dependent. Pt not able to use spoon
 (adapted) 2° & grasp L hand
Transfers - Min assist c sliding board to w/c towards R side
 Med assist to the bed towards the left.
 [Emphasis added.]
Although Exhibit 12 refers to improvement in feeding and dressing, the document does not show that Ms. Head improved to her pre-burn injury level of functioning. References are made to dressing and feeding with the use of the left hand. Additionally, the document also notes Ms. Head is not able to use the adapted cuff spoon with her left hand. The reports do not show that Ms. Head could use a walker. There are no references to the amount of improvement to the right hand where the burn occurred.
Michael Diaz, the occupational therapist who treated Ms. Head, did not differentiate between the treatment time periods, but he felt that his entire treatment and bill were related to the burn injury "because it was a precipitating factor that contributed to her losses globally." Mr. Diaz explained that when Ms. Head's right hand was injured, she stopped using everything, and she became weak with no muscle strength. Mr. Diaz related that he treated the entire patient to regain functions, not just to regain the function of her hands. He noted that the muscles were really injured in Ms. Head's right hand. Mr. Diaz spoke to physical therapists who agreed that there was no potential for Ms. Head to be able to return to moving with a walker, whereas Ms. Head had been able to use a walker prior to her burn injury.
The jury was not manifestly wrong in finding that the plaintiff proved that Mr. Diaz's therapy would not have been necessary "but for" the burn incident and amputations, and that Michael Diaz's occupational therapy from March 13July 30, 1992 was causally related to her burn injury of February 19, 1991.

DAMAGES
The Fund also contends that the $400,000 jury award for general damages is excessive, noting that Ms. Head was insensate in her hands so she felt no physical pain as a result of the burn. The Fund asserts that although Ms. Head experienced physical disfigurement of her fingers, her injury did not justify the general damage award.
General damages involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Ehrman, supra, 94-0312, p. 18, 653 So.2d at 742. Consideration of the jury's determination of damages is limited to a review for abuse of discretion on appeal. The discretion vested in the trier of fact is "great," and even vast, in determining the amount of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), certiorari denied, Maritime Overseas Corp. v. Youn, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). A dispositive question as to whether the general damage award is excessive is whether it shocks the conscience. In Re Medical Review Panel Bilello, 621 So.2d 6 (La.App. 4 Cir.1993), writ denied, 629 So.2d 1139 (La.1993). When damages are insusceptible of precise measurement, much discretion is left to the court for its reasonable assessment. La.C.C. art. 1999; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). The reviewing court *510 must evaluate the particular injuries and their effects on the particular injured persons. Reck v. Stevens, 373 So.2d 498 (La. 1979). Only after a determination of an abuse of discretion is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point that is reasonably within that discretion. Youn, supra.
In the present case prior to the burn injury, despite her impairments, Ms. Head was able to take care of her personal hygiene and could walk with the use of a walker. After she incurred the burn, Ms. Head could not regain the use of her right hand, and she could not regain her ability to function as she had prior to the injury. Although she previously was able to cope with her physical condition, she became severely depressed and gave up after the burn injury. Ms. Head stopped trying to use her muscles so that her overall muscle strength was much weaker. Her emotional well-being changed drastically, and she became deeply depressed and was unable to cope as she had prior to the injury.
Considering the facts and circumstances of this particular case, we cannot say that the general damage award of $400,000, shocks the conscience or is abusively high, given the great discretion afforded the jury.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.