666 So.2d 1210 (1995)
Leon VENTRESS, Individually and as Tutor of His Minor Child, Terry Lenn Hawkins
v.
UNION PACIFIC RAILROAD COMPANY, Norfolk Southern Corporation, Brockhoeff's Chevrolet, Inc., Kelsey-Hayes Company and State of Louisiana, Through the Department of Transportation and Development.
No. 95-CA-1240.
Court of Appeal of Louisiana, Fourth Circuit.
December 28, 1995.
Order on Grant of Rehearing January 29, 1996.
*1212 James J. Morrison, Jr., Metairie, for Insurance Company of North America.
Edward F. Downing, III, Gauthier and Murphy, Metairie, and Edwin R. Murray, New Orleans, for Plaintiff-Appellant.
H. Alston Johnson, III, Phelps Dunbar, Baton Rouge, and William H. Howard, III, Phelps Dunbar, New Orleans, for Missouri Pacific Railroad Company, d/b/a Union Pacific Railroad.
Before BYRNES, LOBRANO and MURRAY, JJ.
*1213 BYRNES, Judge.
On October 25, 1989 a pickup truck driven by plaintiff, Terry Hawkins, was struck by a train. This suit was brought for damages sustained by Hawkins. On May 12, 1994 the jury rendered a verdict finding that Hawkins had suffered damages totalling $20,184,000.00 and apportioning fault as follows: Union Pacific Railroad32%; Brockhoeff's Chevrolet41%; Terry Hawkins5%; Glen Rivet and Sons22%; TOTAL100%. Pursuant to this verdict the trial judge signed a judgment on June 3, 1994 in favor of Leon Ventress in his capacity as curator of his son, Terry Hawkins, and against Union Pacific Railroad, in the amount of $6,458,880.00. On October 4, 1994 the trial court reversed itself and rendered a JNOV in favor of Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company and against Leon Ventress on behalf of Terry Hawkins, dismissing plaintiff's suit. We reverse.
As Hawkins was a minor[1], suit was filed by his father, Leon Hawkins, against Union Pacific Railroad Company[2] as the owner of the railroad tracks and the train that struck Hawkins; Norfolk Southern Corporation as the owner of the locomotives in the train; Brockhoeff's Chevrolet, Inc. as the company that repaired the brakes before the accident on the truck driven by Hawkins; Kelsey-Hayes Company, the manufacturer of the master brake cylinder; and the State of Louisiana, Department of Transportation and Development ("DODT"). Kelsey-Hayes and the DODT were dismissed without prejudice. Those dismissals are not questioned on this appeal. Brockhoeff's settled and was dismissed with prejudice. This dismissal is not questioned on this appeal.
Plaintiff's petition was amended to add Norfolk and Western Railway Company as the owner of the lead locomotive. The Insurance Company of North America filed a petition of intervention to recover medical expenses and worker's compensation income benefits which it has paid and continues to pay on Hawkin's behalf. The trial court dismissed Norfolk-Western and Norfolk Southern on directed verdicts. Those dismissals are not subject to this appeal.
The trial court granted Union Pacific's motion for directed verdict dismissing plaintiff's claims for punitive damages, but this Court reversed. Ventress v. Union Pacific, 94-C-0890 (La.App. 4 Cir. 5/9/94). Plaintiff does not reassert his claim for punitive damages as part of this appeal.
The jury found Brockhoeff's Chevrolet 41% at fault, but Brockhoeff's had already settled with the plaintiff prior to trial. Glen Rivet and Sons, Hawkins employer, was found to be 22% at fault, but it was immune from liability under the Workers Compensation statutes. This immunity is not contested on this appeal. Of the parties found by the jury to be at fault, only Union Pacific was still a defendant at the time the verdict was rendered.
In the trial court's original judgment of June 3, 1994 pursuant to the jury verdict in favor of the plaintiff, Union Pacific as the sole remaining defendant was condemned to pay $6,458,880.00 because of its 32% fault in causing plaintiff's $20,184,000.00 damages.
Subsequently, on October 4, 1994 the trial court rendered a JNOV on motion of Union Pacific, reversing the jury verdict and the judgment of June 3 rendered pursuant to that verdict.

I. The trial court erred in its duty risk analysis when it granted a JNOV in favor of the defendant.
The main issue to be resolved by the fact finder in this case is whether the accident can be attributed solely to the defective brakes on the truck being driven by the plaintiff or whether the railroad had a duty *1214 to warn the plaintiff of the approaching train far enough in advance that plaintiff would have had time to stop and that the railroad's breach of that duty was also a cause in fact of the accident. The jury found that both were contributing causes of the accident, but the trial judge in setting that verdict aside found that: "Reasonable men could not disagree that the failure of the brakes was the sole cause of the accident." Concomitantly, the trial court found no breach of duty by the railroad and that the failure of railroad to give adequate warning was not a cause in fact of the accident. Accordingly, the trial court granted a JNOV in favor of Union Pacific. This was in spite of the fact that the trial court also found that:
The jury's verdict indicates that they believe that the whistle was not blown and that the flashers were defective, thereby breaching the duty owed to Terry Hawkins. There was sufficient evidence to support the jury's finding on each of these issues. [Emphasis added.]
The trial judge's written reasons in support of the JNOV stated:
Testimony of an independent witness as well as that of the conductor was that the truck driven by Terry Hawkins began to slow down. Mr. Alexander Davis stated that the truck slowed to a speed where one could walk along side it. The reasonable inference to be drawn is that Terry Hawkins saw and/or heard the train and was gauging his stopping distance but did not have the braking capability to stop. Therefore, whether or not the whistle was blown is immaterial if the plaintiff driver acted with the desired behavior. Consequently, one must conclude then that the failure of the whistle to blow did not have "something to do" with the injury the plaintiff sustained and was not a substantial factor in bringing about plaintiff's injury. [Emphasis added.]
Union Pacific urges this Court to adopt the reasoning of the trial court by posing the following rhetorical question which it answers in the negative:
Does the railroad have a duty to protect a motorist who is in fact alerted to the oncoming train in time to stop if he had proper brakes but who in fact has brakes that are so deficient that he cannot avoid the collision?
The trial judge apparently subscribed to Union Pacific's theory of duty as her reasons in support of the JNOV state:
The risk sought to be protected against is that of an unsuspecting motorist entering an intersection when a train is approaching. The evidence clearly indicates that Terry Hawkins slowed down. The only inference to be drawn is that Terry Hawkins saw the train. Reasonable men could not arrive at a different conclusion.
It follows then that Terry Hawkins was not an unsuspecting driver, and that this risk of harm is not within the scope of the breached duty. [Emphasis added.] (i.e. A driver who sees the train and who begins to slow but who doesn't have working brakes).
We disagree. The question is not whether plaintiff could have stopped with the amount of warning given had the brakes on the truck been in good condition, but whether the railroad's duty to warn extended to such a distance that had that duty been met in this case it would have provided the plaintiff with sufficient time in which to stop in spite of the defective brakes. The jury apparently grasped this distinction because it related the bulk of the fault to the brakes by assigning 41% of it to Brockhoeff's Chevrolet, the party responsible for repairing the brakes, 22% to plaintiff's employer, Glen Rivet and Sons, for supplying the plaintiff with the truck with the defective brakes, and 5% to the plaintiff for driving the truck with defective brakes for a total of 68% brake related fault. But the jury also assigned 32% of the fault to the railroad, Union Pacific, for the failure to give adequate warning.
LSA-R.S. 32:168 requires that each locomotive be equipped with a bell and a whistle or horn that can be heard at a distance of 900 feet and that one or the other be sounded continuously commencing a minimum of 900 feet prior to the crossing. The jury implicitly found that this was not done in this case. Even the trial judge found that there was *1215 sufficient evidence to support this finding. We agree. Although the testimony of the witnesses differed on this issue, after reviewing the record as a whole we cannot say that the jury as the finder of fact was manifestly erroneous in the way it weighed the testimony of the various witnesses on this issue.
The jury explicitly found that the warning flashers at the crossing were defective so that they did not project a visible warning commensurate with the standards for such warning lights. Once again the trial court acknowledged that the record supported this finding by the jury and we agree.
The trial judge in rendering her JNOV, in effect found that if good brakes could have prevented the accident, then bad brakes must be the sole cause of the accident, and that the railroad owes no duty to a driver with bad brakes under such circumstances. We disagree.
The trial court found and we agree that Hawkins did receive some warning from the flashers that the train was coming as is demonstrated by the fact that he slowed down and almost managed to stop in spite of his defective brakes. We would agree that he in fact could have stopped in time were it not for the defective brakes in spite of the fact that the whistle was not blown and that the flasher gave only a substandard warning distance. But we also note that Hawkins could have stopped in time with only a few more feet of warning in spite of the defective brakesa warning he would have had the whistle been blowing for 900 feet as required by statute or had the warning lights not been substandard and/or defective.
The duty owed by the locomotive is to all approaching vehicles, not just to those with good brakes. The failure of the railroad to give plaintiff the appropriate warning was a breach of its duty, which breach was a cause in fact of the accident. This is a simple case of comparative negligence. The breach of the duty need not be shown to be the sole cause of the injuries; it is a cause-in-fact of the harm if it was a substantial factor in bringing about or not preventing the harm that the duty was intended to protect against. Vonner v. State Dept. of Public Welfare, 273 So.2d 252, 255 (La.1973).
When a train collides with a vehicle the result is almost certain to be devastating, whereas vehicular collisions in ordinary traffic usually have relatively minor consequences. It is safe to assume that the warning distances for trains are liberal and provide for some margin of driver error or inattention, or equipment inadequacy, because a collision with a train even at a slow speed is so much more catastrophic than the impact made by two automobiles colliding at comparable speeds.
"In assessing the negligent conduct of the parties, various factors may influence the degree of fault assigned to each:
[1] Whether the conduct resulted from inadvertence or involved an awareness of the danger,
[2] How great a risk was created by the conduct,
[3] The significance of what was sought by the conduct,
[4] The capacities of the actor, whether superior or inferior, and
[5] Any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967, 974 (La.1985)." [Emphasis added.]
Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 294 (La.1993).
The risk posed by a train that does not give proper warning is very great.
The Supreme Court in Cay v. State, DOTD, 93-0887 (La. 2/24/94), 631 So.2d 393, stated:
The critical inquiry in the duty-risk analysis is whether the risk of the injury sustained by Cay was within the ambit of the duty imposed on the DOTD. The duty to build a bridge railing higher than the center of gravity of most pedestrians is designed to prevent the risk that a pedestrian will accidently stumble and fall over the railing. However, there must be an ease of association between the injury and the rule of law giving rise to the duty. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).

*1216 Here the general manner of harm was foreseeable. The fact that the precise manner of harm (an intoxicated person's staggering or being frightened toward a bridge railing) may not have been anticipated does not break the claim of causation. W. Page Keeton et al., Prosser and Keeton on the Law of Torts Sec. 43 (5th ed. 1984). There is an ease of association between an accidental fall over the railing of a bridge and the failure to build the railing to a height above an average person's center of gravity.
Paraphrasing Cay we can say that: There is an ease of association between this train crossing collision and the failure of the railroad to give proper warning. If anything that ease of association and the finding that Hawkins was within the ambit of the duty owed by Union Pacific is even more obvious and certain in the instant case than was true in Cay where the proof of causation was much less certain.
See also Smith v. Louisiana Health and Human Resources Administration, 637 So.2d 1177 (4 Cir.1994), and Roberts v. Benoit, 605 So.2d 1032 (La.1991).
Plaintiff's negligence in driving a vehicle with defective brakes does not relieve the railroad of its duty to give more than the warning minimally required to prevent a collision under perfect conditions. It only means that the rules of comparative negligence require that any award made to the plaintiff may be reduced to the extent of his contributory negligence. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. Campbell v. DOTD, 94-1052, p. 6 (La. 1/17/95), 648 So.2d 898, 902.

II. The trial court's standard for granting the JNOV was erroneous.
The Supreme Court in Anderson v. New Orleans Public Service, 583 So.2d 829, 832 (La.1991) fixed the standard of review for JNOV's:
In Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), we set forth the criteria to be used in determining when a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of the evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. [Emphasis added.]
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial court does in deciding whether to grant the motion or not, i.e., do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. [Emphasis added.]
The trial court in its reasons stated that: "The reasonable inference to be drawn is that Terry Hawkins saw and/or heard the train and was gauging his stopping distance but did not have the capability to stop." In effect, the trial court found that one inference that could be drawn from the record is that plaintiff was at fault in misjudging his stopping distance. We agree that that is an inference that can be drawn from the record. But Anderson, 583 So.2d at 832, mandates that if a contrary reasonable inference exists in favor of the non-moving party, i.e., the plaintiff, the conflict of inferences "should be resolved in favor of the non-moving party." *1217 In view of the fact that the trial court does not dispute the jury's implicit and explicit findings that the whistle was not blown and that the flashers were defective, it is more reasonable to find, as the jury must have, that plaintiff commenced efforts to stop as soon as he was aware of the train, but was unable to do so in time because of defective brakes and the failure of the railroad to give adequate warning as it had a duty to do. This finding by the trial court does not meet the Anderson standards for a JNOV.
The trial court stated that:
The only inference is that Terry Hawkins saw the train. Reasonable men could not arrive at a different conclusion.
We agree that the only inference to be drawn from the testimony is that Terry Hawkins saw the train and tried to slow down, but the sight line did not give him nearly as much stopping time as the whistle or properly functioning flashers would have. Although no reasonable person would disagree that Terry Hawkins saw the train sometime prior to impact and attempted to slow down, it is a non sequitur to argue from this that the railroad had no further duty to him. There would be no requirement for bells or whistles or flashers if vehicles were expected to rely solely on a visual identification of the oncoming train. This inference does not support the JNOV.
We also agree with the trial court's finding (which coincided with that of the jury) that the brakes were defective. But that in no way diminishes the railroad's duty to warn. It merely means that the Union Pacific is not liable for 100% of plaintiff's damages. The trial court's finding that the brakes were deficient is not sufficient to support its conclusion that the defective brakes were the sole cause of the accident contrary to the jury verdict.
The trial court found that Hawkins could not have stopped even if the whistle had been blown and the flashers had worked properly. This is not consistent with the trial court's finding that the truck had slowed down to a walking pace.[3] Plaintiff contends (and the jury implicitly agreed) that the truck had slowed sufficiently that it would have stopped in time to avoid the collision with only a few more feet of stopping distance. From this the most reasonable inference is that had the railroad given the proper warning plaintiff would have been afforded a more than adequate stopping distance. In reviewing the propriety of the JNOV, the plaintiff is entitled to have the conflict between these inferences resolved in his favor. Anderson, supra.
As we can find no way in which the judgment of the trial court meets the standards for a JNOV, we must reinstate the verdict of the jury. Anderson, supra.
Having reinstated the jury verdict, we must now review it under the manifest error standard of review because it is not as high as the JNOV standard. Russo v. Bratton, 94-2634 (La.App. 4 Cir. 6/29/95), 657 So.2d 777, 784, writ denied 95-1964 (La. 11/13/95), 662 So.2d 474. Therefore, it is possible to find that the trial court was in error in granting the JNOV which has an extremely high standard, but still find that the verdict must be reversed under the high but somewhat lesser manifest error standard. In the instant case we find that the jury verdict also withstands the manifest error standard of review:
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.... [A]ppellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.... When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.... [Where] a factfinder's finding is based on its decision to credit the testimony *1218 of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
We are instructed that before a fact-finder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993). Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[4], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099 (La. 7/5/94), 639 So.2d 216, 221.
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." [Emphasis original.]
Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
In the instant case the trial judge and this Court both agree that there was sufficient evidence to support the jury findings that the train whistle was not blown and that the flashers were defective. We again note that counsel for Union Pacific conceded in oral argument that the failure of the train to give the required warning was a cause in fact of the accident[5], which conclusion is supported by our review of the record as a whole. And, applying the ease of association test, we find that the jury was correct in finding that Union Pacific's duty to warn this plaintiff was no different from its duty to warn any other driver, in spite of the defective brakes on the vehicle plaintiff was driving. We find no manifest error in the jury verdict.
Moreover, as we note at the end of this opinion, Union Pacific failed to file a timely answer to plaintiff's appeal. Therefore, Union Pacific only has the right to argue that the JNOV should be affirmed. It does not have the right to ask for a modification of the reinstated jury verdict once this Court has overturned the JNOV.

III. The fault of the immune employer should be reallocated proportionately.
Plaintiff argues correctly that fault that would normally be allocated to the immune employer must be allocated instead among the remaining parties as though, in effect, that employer never existed. The trial court's original judgment of June 3, 1994 based on the jury verdict was in error in reducing the plaintiff's recoverable damages by the entire amount of the immune employer's fault. Plaintiff argues that in reinstating the jury verdict the fault of the immune employer should be reapportioned among the parties on a pro-rata basis. We agree.
In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, 982 the Supreme Court held that the fault of the immune employer should not be quantified saying:

*1219 If employer fault were quantified, the tort victim ... would suffer a reduction in the percentage of tortfeasor fault available for recovery ...
By this the Supreme Court meant that 100% of the fault must be allocated among the non-employer parties, including the plaintiff, without any deduction for employer fault as though the immune employer did not even exist. In effect Cavalier creates the legal fiction that the negligent, but immune employer was not at fault. In order to apportion 100% of the fault consistent with this legal fiction it is reasonable to expect that the amount of fault attributable to the remaining parties, including the plaintiff, will be proportionately larger, i.e., the fault that would have been assigned to the employer had the employer not been immune should be reallocated among the other parties, including the plaintiff, on a pro-rata basis:
Both plaintiffs and defendants are benefited when more parties are found to be at fault, because less fault will be attributable to contributorily negligent plaintiffs ... [Emphasis added.] Id. at 982.
Cavalier recognizes that plaintiff fault is not calculated in a vacuum but is related to how much fault is allocated to other parties. The fewer parties found at fault, the greater the fault that will be attributable to contributorily negligent plaintiffs as well as defendants, i.e., the fewer the number of parties among whom the fault "pie" is to be divided, the larger the slice apportioned to each.
Reallocation of immune employer fault by extrapolation using proportions is consistent with the admonition of the Cavalier court not to quantify employer fault. The legal effect of doing so is to exclude the employer from the fault allocation by dividing 100% of the fault among the non-employer parties. In Cavalier, 657 So.2d at 984 the Supreme Court held:
Although we now hold that quantification of employer fault is unnecessary and inappropriate, the jury did in fact quantify the employer's fault in the present case. It is therefore necessary to strike that portion of the jury's verdict which erroneously quantified employer fault and assess liability without regard to the employer or to the percentage of fault attributed by the jury to the employer.
In Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991), after the jury had erroneously quantified employer fault, this court determined the proportionate degrees of fault between the contributory negligent plaintiff and the third party tortfeasor, and assessed liability accordingly. In the present case, the plaintiff was not contributorily negligent, and there was only one third party tortfeasor. Since the jury should not have been instructed to quantify employer fault and since Cain's was the only blameworthy party or released person to whom any degree of fault was properly quantified, Cain's is liable for one hundred percent of the tort victim's damages. [Emphasis added.]
As was noted by the Supreme Court in Cavalier, 657 So.2d at 984, footnote 13, extrapolation by proportion achieves the same result as "the trier of fact presumably would have achieved if instructed to ignore the employer's fault and to quantify only the fault of the plaintiff and the third party tortfeasor(s)." In other words, since we are otherwise satisfied with the proportions of fault attributed by the jury to the various parties, we find it reasonable to assume that had the jury allocated the 22% of the fault it assigned erroneously to the immune employer, instead allocated that 22% among the non-employer parties ab initio as it should have done, it would have done so according to the same proportions.[6] Reallocation by *1220 extrapolation using proportions prevents a party with a very small degree of negligence from being assigned a disproportionately large percentage of negligence because of the immune employer as might occur if the extrapolation were done on a per capita basis.
Thus we are not saying that the injured employee is responsible for a portion of the employer fault as though some kind of reverse respondeat superior applied. We are saying that where no employer fault can be considered, in order to allocate 100% of the fault without taking employer fault into account, all parties, including the plaintiff, will presumably be assigned proportionately larger amounts of fault. That the result works out to the same percentages of fault as though we were to say that each party is responsible for his pro rata share of employer fault is in contemplation of the law a coincidence. See the discussion of Guidry v. Frank Guidry Oil, 579 So.2d 947 (La.1991) in Cavalier, 657 So.2d at 984, including footnote 13, to this effect.
The inference we draw from Cavalier is that it is error for the jury to fix the amount of employer fault, but that once this has been done an acceptable way of correcting the error is to extrapolate using proportions as discussed above. This was the method employed by the line of cases represented by Guidry which was reinstated by Cavalier. It is probably as accurate as any other method of allocating fault which by its very nature is more a matter of judgment than an exact science, and it has the added advantage of preserving as much as practicable the reasoning of the jury which, after all, was in the best position to weigh the fact issues. Thus it seems that it is not so much the quantification of immune employer fault that the Cavalier court opposes, as the failure to reallocate that fault among the remaining parties nunc pro tunc the same as though that fault had been assigned to the non-employer parties ab initio.
Extrapolating by proportions and then assigning fault on that basis as though employer fault had never existed also avoids the problem raised in footnote 8 of Cavalier, 657 So.2d at 982, although the problem raised by that footnote does not exist in this case as there is more than one tortfeasor in addition to the immune employer.

IV. "Recoverable damages" is a term of art meaning total damages less a reduction for plaintiff's percentage of fault. "Recoverable damages" is not reduced by the percentage of fault attributable to a settling tortfeasor, although the balance due plaintiff on his recoverable damages is reduced by the percentage of fault attributable to a settling tortfeasor.
Plaintiff argues that under LSA-C.C. art. 2324 B as interpreted by Touchard v. Williams, 617 So.2d 885 (La.1993), Union Pacific is liable for 50% of plaintiff's recoverable damages without taking into account his settlement with Brockhoeff's Chevrolet. This raises the question posed by the Supreme Court in Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, 984 at footnote 12:
This court has not yet addressed the question of the meaning of the term "recoverable damages." The term may mean (1) total damages; (2) total damages less a reduction to reflect the fault of the plaintiff; or (3) total damages less reductions to reflect the fault of the plaintiff and the fault of any settling tortfeasor(s). David W. Robertson, Solidary Liability in TortUnderstanding Gauthier and Touchard, 41 La.B.J. 334, 336 (1993).
In Ehrman v. Holiday Inns, Inc., 94-0312 (La.App. 4 Cir. 3/29/95), 653 So.2d 732, 741 this Court interpreted `"recoverable damages' to mean total damages minus a reduction of the plaintiff's fault."
After reallocating the immune employer's fault, the $20,184,000 in total damages would be apportioned by virile shares according to their respective degrees of fault; 6.41% or $1,009,200 to the plaintiff, 52.564% or $10,609,356 to Brockhoeff Chevrolet, and 41.026% or $8,565,444 to Union Pacific. Therefore, the judgment amount of $20,184,000 less $1,009,200 attributable to plaintiff fault results in recoverable damages of $19,174,800. Pursuant to LSA-C.C. art. 2324 B *1221 Union Pacific would be solidarily liable to plaintiff for up to 50% of that amount or $9,587,400 if we ignore plaintiff's settlement with Brockhoeff Chevrolet.
In Cavalier v. Cain's Hydrostatic Testing, Inc., 94-1496 (La. 6/30/95), 657 So.2d 975, 981, the Supreme Court stated:
Louisiana has long recognized that since the tort victim's release of one tortfeasor deprives the remaining tortfeasors of their contribution rights against the settling tortfeasor, the tort victim's recovery must be reduced by the proportionate share of the settling tortfeasor. See Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App.3d Cir.1964); Dill v. State, Dept. of Transp. and Dev., 545 So.2d 994 (La. 1989). Therefore, quantification of the fault of a settling tortfeasor is not only appropriate, but is necessary, whether that tortfeasor is a party and has been dismissed from the action or whether the settlement occurred before the tortfeasor was ever made a party. [Emphasis added.]
In Cavalier, 657 So.2d at 985, footnote 7, the court equated "proportionate share" with "virile share":
Solidary obligors among themselves, are each liable for his or her "virile portion," which in the case of an obligation arising in tort is proportionate to the fault of each obligor. La.Civ.Code art. 1804.
Plaintiff relies on Ehrman to support his contention that his release of Brockhoeff does not limit his recovery from Union Pacific under LSA-C.C. art. 2324 B because Ehrman indicates that "recoverable damages" is not reduced by "the fault of any settling tortfeasors." Ehrman, 653 So.2d at 741. We agree that Ehrman stands for the proposition that "recoverable damages" is not reduced by the fault of any settling tortfeasors, because "recoverable damages" is a term of art. "Recoverable damages" is the base upon which the 50% solidary liability under LSA-C.C. art. 2324 B is calculated. Although "recoverable damages" is not reduced by the proportionate share of the fault of the settling tortfeasor, plaintiff's recovery is. When a plaintiff settles with a tortfeasor he is considered to have recovered that settling tortfeasor's full proportionate share of the damages as a payment towards his recoverable damages, just as a payment on a car reduces the balance due on the car, not the purchase price. Therefore, total damages is analogous to the sticker price of the car and "recoverable damages" is the final price actually agreed upon by the buyer, neither of which change as payments are made on the car, although the balance due does. Thus, "recoverable damages" under LSA-C.C. art. 2324 B (which is the figure upon which the 50% solidary liability is based) remains at total liability less plaintiff's proportion of fault, although the balance due to plaintiff on that amount is reduced each time plaintiff settles with a tortfeasor found to be at fault.
For example, assume a plaintiff who is 20% at fault gets a $10,000,000.00 judgment against four defendants, each of whom is also found to be 20% at fault. Reducing the $10,000,000.00 by plaintiff's 20% fault we arrive at recoverable damages of $8,000,000.00. Assume that plaintiff settles with one of the tortfeasors. Recoverable damages remains at $8,000,000.00 but plaintiff's settlement is considered the legal equivalent of having collected $2,000,000.00 out of that $8,000,000.00, irrespective of the amount actually received in settlement. Plaintiff may still pursue any of the remaining tortfeasor's for up to $4,000,000.00 (50% of the $8,000,000.00), not to exceed $6,000,000.00 as plaintiff is deemed to have already collected $2,000,000.00 from the settling tortfeasor and neither Touchard nor LSA-C.C. art. 2324 B should be read as a means of allowing plaintiff recovery in excess of 100%. This $4,000,000.00 is then reduced to the extent that the release of the settling tortfeasor has prejudiced the rights of the paying defendant to seek contribution or indemnity for the amount he paid in excess of his proportionate share because of the 50% solidary liability provision of LSA-C.C. art. 2324 B. In this example, the excess of solidary liability over proportionate liability would be $2,000,000.00 (the difference between the $2,000,000.00 the defendant would owe based solely on his proportionate fault and the $4,000,000.00 he is required to pay based on 50% solidary liability). The proportionate share of the settling tortfeasor of that *1222 excess $2,000,000.00 would be 1/3 which the paying tortfeasor would have been able to collect from the settling tortfeasor by way of contribution, had the settling tortfeasor not settled. The paying defendant is entitled to deduct that 1/3 of $2,000,000.00 from the $4,000,000.00 he would otherwise be required to pay. Therefore, in this example, the plaintiff could collect up to $3,333,333.33 from any of the three remaining defendants not to exceed $6,000,000.00 in the aggregate. In the event the plaintiff settled with two instead of just one of the tortfeasors, plaintiff could still collect up to $4,000,000.00 from either of the remaining tortfeasors under Touchard, not to exceed $4,000,000.00 total recovery in the aggregate from both remaining defendants as plaintiff is deemed to have already collected $4,000,000.00 from the two settling tortfeasors. The $4,000,000.00 for which the paying defendant would be liable in consequence of 50% solidary liability must be further reduced by the 2/3 proportionate share of the two settling tortfeasors' responsibility to contribute to the $2,000,000.00 out of the $4,000,000.00 that exceeds the paying defendant's $2,000,000.00 proportionate liability. Therefore, in this second example plaintiff could collect up to $2,666,666.67 from either of the two remaining defendants, not to exceed $4,000,000.00 in the aggregate.
If plaintiff were to have settled with three of the tortfeasors, he could only collect $2,000,000.00 from the remaining tortfeasor not because recoverable damages had been reduced, but because plaintiff is deemed to have already collected $6,000,000.00 from the settling tortfeasors and cannot collect more than $8,000,000.00 total. The approach adopted here is the only one that is consistent with Ehrman, with what the Supreme Court said in Cavalier about proportionate reduction for the release of settling tortfeasors, and with the statement in LSA-C.C. art. 1804 that "a virile proportion is proportionate to the fault of each obligor."
The previously quoted footnote twelve of Cavalier, 657 So.2d at 984, states that a possible alternative approach would be to reduce total damages to reflect the fault of the plaintiff and the fault of any settling tortfeasor(s). After careful analysis we conclude that this approach would be unduly harsh to plaintiffs, inconsistent with the spirit of Touchard, and unnecessary to achieve the fairness for defendants mandated by the language in Cavalier, 657 So.2d at 981, discussing Louisiana's long history of proportionately reducing the plaintiff's right to pursue the remaining tortfeasors after he has settled with one or more other tortfeasors. This is best demonstrated by way of another example. Assume once again a plaintiff who is 20% at fault with a $10,000,000.00 judgment against four defendants each of whom is also found to be 20% at fault. "Recoverable damages" would be limited to $8,000,000.00 because of plaintiff's 20% fault. If plaintiff settles with one defendant's recoverable damages would be reduced to $6,000,000.00 according to this alternative approach. Based on 50% solidary liability, the most that the plaintiff could recover from any one defendant would be $3,000,000.00 instead of the $3,333,333.33 plaintiff would be entitled to in the first example above where recoverable damages were not reduced by the fault of the settling tortfeasor, but where the remaining defendants were given the benefit of the effect of the release of the settling tortfeasor. Where the rationale as expressed in Cavalier for giving the remaining defendants a reduction in solidary liability proportionate to the prejudice they sustain as a result of the release of the settling tortfeasor is to compensate those non-settling defendants for that prejudice, the reduction of recoverable damages by the amount of the fault of any settling tortfeasors cannot be justified. As may be seen by reference to this example, if recoverable damages is reduced by the fault of the settling tortfeasor the amount for which the non-settling tortfeasor may be held solidarily liable is $333,333.33 less than it need be in order to protect him from prejudice as a result of the release of the settling tortfeasor.
The other possibility suggested by Cavalier is that "recoverable damages" might mean "total damages." This definition works only where there is no plaintiff fault and the two concepts are by coincidence coextensive, as was the case in Touchard. However, where there is plaintiff fault, to define "recoverable damages" as total damages would do violence *1223 to normal methods of statutory construction. LSA-C.C. art. 2323 mandates that "the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss." Thus under LSA-C.C. art. 2323 plaintiff must unquestionably suffer a reduction in his recovery in proportion to his fault. Plaintiff does not contend otherwise. Were this not the case, comparative fault would be rendered meaningless. To move from this position to the position that "recoverable damages" means "total damages" for the purposes of determining the base used to calculate the 50% solidary liability of LSA-C.C. art. 2324 B necessarily means that the definition of the term "recoverable damages" is given a drastically different meaning in two adjacent and intimately related code articles, with no explanation for doing so. If this were the case, one would at least expect that LSA-C.C. art. 2324 B would say that "for purposes of this article `recoverable damages' shall mean total damages" or words to that effect in order to distinguish it from the immediately preceding LSA-C.C. art. 2323. Even more untenable is the casuistry that would attempt to read some significance into the reversal of word order between "damages recoverable" as referred to in LSA-C.C. art. 2323 and LSA-R.S. art. 2324 B "recoverable damages." This is a distinction without a difference.
Having reviewed the three possible alternatives suggested by the Supreme Court in Cavalier, we are satisfied that the approach we have adopted above is the only one that will bear up under rigorous analysis and results in no prejudice to either plaintiffs or defendants.

Cavalier, 657 So.2d 975, 981 states:
Louisiana has long recognized that since the tort victim's release of one tortfeasor deprives the remaining tortfeasors of their contribution rights against the settling tortfeasor, the tort victim's recovery must be reduced by the proportionate share of the settling tortfeasor. [Emphasis added.]
LSA-C.C. art. 2324 B specifically provides that: "Under the provisions of this Article, all parties shall enjoy their respective rights of indemnity and contribution." This language in LSA-C.C. art. 2324 B and Cavalier make it clear that where a defendant would have been able to go against the settling tortfeasor to recover that portion of the 50% solidary liability that exceeded his actual percentage of fault, then to that extent plaintiff relinquishes his right to collect the difference between the non-settling defendant's actual percentage of fault and the 50% for which he could be liable under LSA-C.C. art. 2324 B and Touchard.
Therefore, in accordance with the long unbroken line of jurisprudence concerning settling tortfeasors culminating with Cavalier, plaintiff's recovery from Union Pacific under the 50% solidarity provisions of LSA-C.C. art. 2324 B are limited to the extent that plaintiff's release of Brockhoeff Chevrolet prejudiced Union Pacific's right to claim contribution from Brockhoeff Chevrolet. Simply put, plaintiff cannot increase Union Pacific's liability by settling with Brockhoeff Chevrolet.
Had Brockhoeff Chevrolet not settled, it would have been liable for $10,609,356. Plaintiff's settlement with Brockhoeff was the legal equivalent of receiving that $10,609,356. Having in the contemplation of the law collected it once from Brockhoeff Chevrolet, plaintiff can collect no part of it again from Union Pacific. LSA-C.C. art. 2324 B makes Union Pacific solidarily liable but "only to the extent necessary for the person suffering injury, death or loss to recover fifty percent of his recoverable damages ..." But plaintiff's settlement with Brockhoeff was the legal equivalent of receiving 52.564% of actual damages which is 55.33% of recoverable damages. It goes without saying that LSA-C.C. art. 2324 B was never intended to permit the plaintiff to collect 50% of his recoverable damages from one joint tort feasor when he has already collected the legal equivalent of over 50% of that amount from another.
It is not hard to think of scenarios in which plaintiff's theory would permit recovery far in excess of "recoverable" damages and even in excess of actual damages if we fail to take settling tortfeasors into full account. For example, assume the following *1224 facts: A 10% contributorily negligent defendant with $10,000,000 in total damages settles with four defendants who were each 20% negligent for $6,000,000 which is 60% of plaintiff's total damages. A fifth defendant who is 10% at fault does not settle. Plaintiff's recoverable damages would be the $9,000,000$10,000,000 total damages less $1,000,000 attributable to plaintiff's own 10% contributory negligence. Following plaintiff's logic, after settling with the four other defendants for $6,000,000 he could then pursue the sole remaining defendant who was only 10% liable for an additional 50% of his recoverable damages, i.e., $4,500,000 without any reduction for the prior settlements. Thus, by settling with tortfeasors who were 80% at fault for 75 cents on the dollar plaintiff could recover 105% of his actual damages and 116.7% of his recoverable damages. Neither LSA-C.C. art. 2324 B nor Touchard intended to provide such windfalls for plaintiffs. It is against public policy to allow plaintiffs to manipulate the settlement process in ways that would permit them to recover more than their actual damages while settling for less.
Limiting Union Pacific's exposure to its virile share once plaintiff settled with Brockhoeff Chevrolet is the fairest result not only because it is the only one that prevents excess recovery, but because plaintiff was the only party paid for Brockhoeff Chevrolet's release and can be assumed to have factored the impact of the release on his overall potential for recovery into his settlement price. As the plaintiff set the price and was the only party paid for the release, it is only fair that he absorb the cost of releasing Brockhoeff Chevrolet. Cf. Harvey v. Travelers Insurance Company, 163 So.2d 915 (La.App. 3 Cir.1964).

V. The fault of the settling tortfeasor includes its proportionate share of immune employer fault.
Although plaintiff agrees that the fault erroneously assigned by the jury to the immune employer should be reallocated proportionately, he contends that none of that fault should be assigned to the settling tortfeasor because that would reduce plaintiff's recovery, because plaintiff's recovery from Union Pacific is reduced in proportion to the fault allocated to the settling tortfeasor.
In reallocating the 22% immune employer fault a proportionate share must be assigned to the settling tortfeasor to the same extent as though that tortfeasor had not settled. One reason for this is, as explained above, we must treat this as though there never was any immune employer fault and that 100% of the fault was attributable to non-employer parties ab initio, which would include the settling tortfeasor. Thus, it is technically not immune employer fault that we are assigning to the settling tortfeasor any more than we did earlier in this opinion to Union Pacific. This is the amount of fault that should have been assigned to the settling tortfeasor, Brockhoeff's Chevrolet, from the beginning based on the legal fiction created by Cavalier that there never was any employer fault. Therefore, the virile share of the settling tortfeasor, Brockhoeff's Chevrolet, is 52.564% of the total damages, not 41% as found by the jury.
Plaintiff additionally makes the policy argument that no part of the 22% fault assigned by the jury to the immune employer should be allocated to the settling tortfeasor because doing so would discourage settlements. Plaintiff is correct in suggesting that allocating no part of immune employer fault to the settling tortfeasor would promote settlements for the same reason that not reducing the tort victim's recovery by the proportionate share of the settling tortfeasor would promote settlements. It would promote settlements because it would enable the plaintiff to recover more than 100% of actual damages by settling for less than 100% of the liability of the settling parties. In other words plaintiff could actually increase his total recovery by discounting his claim against the settling tortfeasors which would entitle him to collect more from the non-settling tortfeasors. For example, consider the situation in which the jury found the immune employer 50% at fault, and five contributorily negligent defendants 10% at fault each. The virile share of each of the defendants would be 20% because no part of the fault may be assigned to the immune employer. *1225 However, using plaintiff's reasoning he could settle with four out of five of the defendants for a total of 60% of his claim which represents a substantial discount from their 80% virile share, and still collect at trial another 70% of his damages from the sole remaining defendant (defendant number five's 20% virile share plus all of the 50% immune employer share which would be allocated to him if we were to follow plaintiff's reasoning.) This would give plaintiffs and those settling defendants a powerful incentive to settle. The plaintiff could collect 130% of his damages and the settling tortfeasors would be liable for only ¾ of their proportion of the fault. And the threat of being the sole remaining defendant stuck with the bill for 100% of the 50% of the immune employer fault would create a virtual stampede to settle on the defendants' side of the case. The proportion of fault assigned to any one tortfeasor is in no way related to whether or not another tortfeasor settles. To hold otherwise would be the same as saying that the negligence of the non-settling tortfeasor increases every time another tortfeasor settles. In spite of the fact that the frequency of settlements would increase drastically if plaintiff's argument were adopted, the courts have wisely recognized the patent unfairness of allowing a plaintiff by settling with some defendants to increase the proportion of the liability burden to be borne by a non-settling defendant.

VI. The intervention of the Insurance Company of North America as compensation insurer of plaintiff's employer.
The parties stipulated to the intervention of the Insurance Company of North America (INA) as the compensation insurer of plaintiff's employer and to the fact that INA had paid $1,290,017.09 in compensation benefits through April 14,1994. INA is entitled to reimbursement for that amount as well as benefits paid since that date subject to the limitations set forth LSA-R.S. 23:1101 B. We remand this matter to the trial court for a determination of the amount of reimbursement owed to INA as well as determination of the allocation of costs and legal fees in accordance with Moody v. Arabie, 498 So.2d 1081 (La.1986).[7]

VII. Union Pacific's answer to the appeal was untimely.
Union Pacific filed an answer to plaintiff's appeal which was rejected by this court as untimely. Union Pacific took the position that the time for filing an answer to an appeal does not begin to run until the entire record has been filed with the clerk of this Court. We held to the contrary based on the facts of this case. Those facts are as set forth in the order issued by this Court when we rejected Union Pacific's answer. The text of that order is set forth in full in the footnote below.[8]

*1226 DECREE
For the foregoing reasons the judgment of the trial court is reversed. Judgment is hereby rendered in favor of plaintiff and against Union Pacific Railroad Company (a/k/a Missouri Pacific Railroad Company) in the sum of $8,565,444. It is further decreed that this case be remanded to the trial court for a determination consistent with this opinion of the issues raised by the intervention of the Insurance Company of North America.
REVERSED AND RENDERED IN PART; REMANDED IN PART.
LOBRANO, J., concurs.
LOBRANO, Judge, concurring.
I concur in the majority result. In my opinion, a plaintiff cannot recover up to 50% of his recoverable damages as set forth in Article 2324(B) in those situations where his release of a settling tortfeasor has prejudiced the remaining tortfeasor's right of contribution. Because Union-Pacific can not seek contribution from Brockhoeff Chevrolet, plaintiff's recovery is limited to Union-Pacific's share of the fault, after reapportionment of employer fault. See, Harvey v. Travelers Ins. Co., 163 So.2d 915 (La.App. 3rd Cir. 1964).
PER CURIAM.

ON REHEARING
We grant rehearing for the limited purpose of addressing Union Pacific's contention that the failure of the trial court to rule on its motion for a new trial in accordance with the provisions of LSA-C.C.P. art. 1811 C deprives this Court of jurisdiction to render the judgment rendered by this Court. Sledge v. Continental Cas. Co., 26,472 (La. App. 2 Cir. 1/25/95), 654 So.2d 358, vacated on rehearing (5/10/95).
The failure of Union Pacific to raise this issue by means of a timely answer to the appeal is not sufficient to confer jurisdiction on this Court.
However, in the same judgment dated October 4, 1994 in which the trial court granted the JNOV it also denied Union Pacific's motion for a new trial in the following terms:
"IT IS ORDERED that defendant's Motion for a New Trial is denied ..."
This denial of the motion for new trial encompasses the possibility that the JNOV could be reversed on appeal as contemplated by LSA-C.C.P. art. 1811 C.
There is no requirement in LSA-C.C.P. art. 1811 C that the denial of the new trial be worded in any particular manner, or that LSA-C.C.P. art. 1811 C be specifically cited.
Cases such as Giraud v. Johns, 523 So.2d 931, 932 (La.App. 4 Cir.1988), writ denied, 531 So.2d 282 (La.1988), and Sledge, supra, are inapposite because in those cases no ruling was made on the motion for new trial.
*1227 Accordingly, the previously rendered judgment of this Court remains unchanged.
AFFIRMED.
NOTES
[1] Terry Hawkins became a major subsequent to the time the original suit was filed. Apparently Hawkins' suffered brain damage as a result of the accident and is not mentally competent. Therefore, when he became a major his father, Leon Ventress changed his representative capacity from that of tutor of his minor son to that of curator of his mentally incompetent son.
[2] Union Pacific refers to itself in pleadings as "Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company." We shall refer to the company simply as "Union Pacific" consistent with the usage employed by most of the briefs.
[3] It is again noted that counsel for Union Pacific conceded the question of "cause-in-fact" in oral argument.
[4] See, LSA-Const. Art. 5, section 10(B).
[5] Defendant preferred to argue instead that the train owed no duty to give the customary warnings to this particular plaintiff.
[6] In this case the formula would be one in which the fault of each non-employer tortfeasor equals a fraction the numerator of which is the percentage of fault found by the jury expressed as a whole number and the denominator is 78 which is the total percentage of fault expressed as a whole number assigned by the jury to the non-employee tortfeasors, resulting in the following quantification of fault:

Union Pacific 32/78 or 41.026%
Brockhoeff's Chevrolet 41/78 or 52.564%
Terry Hawkin 5/78 or 6.410%
Total 78/78 or 100%

The 22% immune employer fault is allocated among these parties according to the percentages shown as though the jury had never allocated any fault to the immune employer.
[7] In making that decision we wish to note that the briefs submitted by INA were particularly helpful to this court and were the only ones to discuss the "ease of association" test.
[8] On June 8, 1995 twenty-three volumes of the record in this appeal were filed with this Court. On July 6, 1995 two volumes of supplemental records were filed with this court. On July 20, 1995 the appellee, Union Pacific Railroad Company, filed an answer to the appeal. Appellee filed a motion to consider answer to appeal as timely filed on July 21, 1995 stating that appellee had been informed by employees in the office of the clerk of this Court that appellee's answer was untimely because it was filed more than 15 days after the June 8, 1995 date. Appellee argues that the 15 day period did not begin to run until July 6, 1995 when the two supplemental records were filed.

LSA-C.C.P. art. 2133 A provides that an appellee has 15 days "after the return day or the lodging of the appeal whichever is later in which to answer an appeal." Union Pacific argues that the appeal was not lodged in this case until the two supplemental records were filed on July 6, 1995. Deutsch, Kerrigan & Stiles v. Rault, 389 So.2d 1373 (La.App. 4 Cir.1980), cert. den., 396 So.2d 883 (La.1980) and Thomas v. Department of Welfare, 454 So.2d 839 (La.App. 4 Cir.1984).
The answers at issue in both Deutsch, Kerrigan & Stiles and Thomas were filed prior to the effective date of LSA-C.C.P. art. 2127.2 which provides for the lodging of the record prior to the filing of the transcript. The two supplemental volumes filed on July 6, 1995 were transcript volumes. Eight volumes of pleadings and other documents along with fifteen volumes of transcript were originally filed on June 8, 1995.
In Deutsch, Kerrigan & Stiles the record consisted of only three volumes. Therefore, it is reasonable to assume that the one volume that was filed subsequent to the first two volumes constituted a substantially greater proportion of the record than the two volumes out of twenty-five that are involved in the instant case. In Thomas all of the transcript was filed late. In the instant case substantially all of the record was filed on June 8, 1995.
Appellee acknowledges in its brief in support of its motion that it was notified by a letter from the clerk's office dated June 8, 1995 that the appeal had been lodged with this court on June 8, 1995. Appellee attaches a copy of that letter to its brief as an exhibit.
It is common for the record to be supplemented. In fact, appellee has also filed a motion to supplement the record which this Court will grant contemporaneously with this denial of appellee's motion to consider appeal timely filed. This may not be the last time a party to this suit makes a legitimate request to supplement the record. If this Court were to adopt appellee's argument the time for answering would be virtually open ended. The Code of Civil Procedure expresses an intent that the time for answering an appeal be brief.
The opinion of this Court might be different if the appellee could show that the small portions of the record not originally filed on June 8, 1995 in any way materially affected its ability to answer the appeal. But appellee does not allege that it did. Where the appellee can show that its ability to effectively answer an appeal has in any way been materially prejudiced by the failure to have access to the complete record on appeal, this Court might rule differently.
For the foregoing reasons this Court finds that the answer on behalf of Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company is untimely.
THEREFORE, IT IS ORDERED THAT the motion on behalf of Missouri Pacific Railroad Company, d/b/a Union Pacific Railroad Company to consider answer to appeal as timely filed be denied.